UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GWEN WRIGHT-ADSIDE,

        Plaintiff,

v.                          CASE No. 8:12-CV-600-T-TGW

CAROLYN W. COLVIN,[1]
Commissioner of Social Security,

        Defendant.

_____

## O R D E R

The plaintiff in this case seeks judicial review of the denial of her claim for Social Security disability benefits.[2] Because the decision of the Commissioner of Social Security is supported by substantial evidence and contains no reversible error, the decision will be affirmed.

I.

The plaintiff, who was fifty-one years old at the time her insured status expired and who has a high school education with some college, has

_____

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security and should, therefore, be substituted for Commissioner Michael J. Astrue as defendant in this action. See 42 U.S.C. 405(g); Fed.R.Civ.P. 25(d).

[2]The parties have consented in this case to the exercise of jurisdiction by a United States Magistrate Judge (Doc. 14).

worked as an insurance sales manager and director of non-profit organizations (Tr. 65, 70, 73, 77). She filed a claim for Social Security disability benefits, alleging that she became disabled due to chronic chest pain, inability to concentrate "at times" and stay focused "for long periods of time," panic attacks, chronic anxiety and fatigue, high blood pressure, pain in the stomach and pelvic areas, depression, and diarrhea (Tr. 64, 71). The claim was denied initially and upon reconsideration.

The plaintiff, at her request, then received a <u>de novo</u> hearing before an administrative law judge. The law judge issued an unfavorable decision (Tr. 17-24), and the Appeals Council denied the plaintiff's request for review (Tr. 5-8). The claimant subsequently sought judicial review of the decision in the United States District Court for the Middle District of Georgia (<u>Wright-Adside</u> v. <u>Astrue</u>, Case No. 5:06-CV-112-HL), where the matter was remanded for further consideration (Tr. 628). Accordingly, the Appeals Council issued an order on November 24, 2007, vacating the decision and remanding the case (Tr. 637-39).

Upon remand, another hearing was held by the same law judge. The law judge rendered a new decision, finding that the plaintiff was not

disabled (Tr. 600-17). The Appeals Council let the decision of the law judge stand as the final decision of the Commissioner (Tr. 594-96). The plaintiff appealed the decision to this court (Wright-Adside v. Astrue, Case No. 8:09-CV-824-T-EAJ), which remanded the case for further consideration of the opinion of Dr. Edward Layne, the plaintiff's treating gastroenterologist (Tr. 740-49).[3] The Appeals Council then vacated the law judge's decision and again remanded the case (Tr. 752-54).

On May 10, 2011, a third hearing was held before a different law judge. Following that hearing, the law judge found that, through her date last insured of September 30, 2004, the plaintiff had severe impairments of hypertension, mitral valve prolapse, gastroesophageal reflux disease (GERD) with hiatal hernia, gastric ulcer disease, gastritis, colon polyps, anxiety with panic symptoms, and major depression (Tr. 724). He concluded further (Tr. 729):

> Through the date last insured, the claimant had the residual functional capacity to perform up to light level work as defined in 20 CFR 404.1567(b), except no climbing long vertical ladders, scaffolds,

---

[3]The plaintiff moved to Florida in 2007.

ropes, or at unprotected heights. Mentally, she was limited to understanding, remembering, and carrying out simple, routine, repetitive unskilled instructions with the ability to maintain sufficient concentration, persistence, and pace and to perform mostly simple tasks for 2 hours at a time. This considered the claimant taking the usual breaks. The claimant had the ability to adjust to simple changes in a work setting and to make basic decisions involving superficial contact with the public and avoidance of interaction with large crowds. The claimant had the ability to stand 4 to 5 hours at a time and to sit 2 to 4 hours at a time, considering the usual breaks, with occasional crawling and bending. The claimant had to avoid extreme temperatures and humidity; that is preferably the claimant would be in a temperature controlled air-conditioned environment. The claimant was precluded from extensive driving.

The law judge determined that these restrictions prevented the plaintiff from returning to her past relevant work (Tr. 737). However, based on the testimony of a vocational expert, the law judge found that there are jobs that exist in significant numbers in the national economy that the plaintiff could have performed, including mail sorter, marker, and office helper (Tr. 738). The law judge therefore decided that the plaintiff was not disabled (Tr. 739).

The Appeals Council let the decision of the law judge stand as the final decision of the Commissioner.

II.

In order to be entitled to Social Security disability benefits, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. 423(d)(1)(A).   A "physical or mental impairment," under the terms of the Social Security Act, is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."   42 U.S.C. 423(d)(3).   In this case, the plaintiff must show that she became disabled before her insured status expired on September 30, 2004, in order to receive disability benefits. 42 U.S.C. 423(c)(1); Demandre v. Califano, 591 F.2d 1088, 1090 (5th Cir. 1979), cert. denied, 444 U.S. 952.

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence. 42 U.S.C.

-5-

405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971), quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Under the substantial evidence test, "findings of fact made by administrative agencies ... may be reversed ... only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004)(en banc), cert. denied, 544 U.S. 1035 (2005).

It is, moreover, the function of the Commissioner, and not the courts, to resolve conflicts in the evidence and to assess the credibility of the witnesses. Grant v. Richardson, 445 F.2d 656 (5th Cir. 1971). Similarly, it is the responsibility of the Commissioner to draw inferences from the evidence, and those inferences are not to be overturned if they are supported by substantial evidence. Celebrezze v. O'Brient, 323 F.2d 989, 990 (5th Cir. 1963).

Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the court is not to reweigh the evidence, but is limited to determining whether the record as a whole contains sufficient evidence to permit a reasonable mind to conclude that the claimant is not disabled. However, the court, in its review, must satisfy itself that the proper legal standards were applied and legal requirements were met. Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988).

### III.

The plaintiff attacks the law judge's decision on two main grounds. The relevant evidence on those challenges is that which has a bearing on the plaintiff's condition between November 1, 1997, the alleged disability onset date, and September 30, 2004, the plaintiff's date last insured. That evidence does not sustain the plaintiff's challenges to the law judge's decision.

A. The plaintiff first argues that the law judge failed to assess properly the opinions of her treating gastroenterologist, Dr. Edward A. Layne,

and the examining psychologists, Dr. John C. Whitley, III, and Dr. Robert T. Shepherd (Doc. 15, pp. 10-16). This assertion does not support reversal.

1. Dr. Layne treated the plaintiff between June 2001 and October 2002, for GERD, gastritis, colitis, abdominal cramps, chest pain, diarrhea, and peptic ulcer disease (Tr. 329-30, 421-22, 439-40, 518-26). During this time, Dr. Layne performed multiple esophagogastro-duodenoscopies (EGDs) with biopsies and endoscopic photography (Tr. 329-30, 421-22, 439-40). These procedures revealed a hiatal hernia at the gastroesophageal junction and GERD (id.). Following the October 2002 EGD, Dr. Layne's endoscopic impression was hiatal hernia, GERD, and nodular gastritis in the antrum (Tr. 421).

On February 9, 2004, Dr. Layne completed a questionnaire regarding the plaintiff's functional limitations (Tr. 528-29). He stated that the plaintiff can lift and carry 10-20 pounds maximum at one time and no more than 8-10 pounds frequently (Tr. 528). The plaintiff could stay on her feet for 4-5 hours at a time; stand/walk for 2-4 hours in an 8-hour workday; sit for 2-4 hours at a time; and sit for 4-5 hours during an 8-hour workday (id.). Dr.

Layne opined that the plaintiff could never bend and only occasionally crawl (id.).   The plaintiff was moderately limited against exposure to marked changes in temperature and humidity; mildly limited against driving automotive equipment; and severely limited against exposure to dust and fumes (id.).   Dr. Layne stated that "when [the plaintiff was] in extreme pain, continuous bending or stooping could cause bile reflux, GERD, [and] ulcer flare up" (id.).   He noted that the plaintiff's pain would significantly reduce her concentration and attention and produce emotional stress or a reduction in the ability to cope with stress (Tr. 529).   The pain would occur even if these exertional limitations were followed (id.).   Dr. Layne further indicated that, during a 40-hour work week with 8-hour workdays and while working at the limits he imposed, the plaintiff would be in mild or no pain 15% of the time; moderate pain 30% of the time; moderately severe pain 35% of the time; and severe/extreme pain 20% of the time (id.).   Finally, Dr. Layne noted that the plaintiff had been functioning at the level described in the questionnaire since before her first visit with him (id.).

Opinions from treating physicians should be given substantial or considerable weight unless there is good cause for not giving them such weight. Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists when the treating physician's opinion is not bolstered by the evidence, the evidence supports a contrary finding, or the opinion is conclusory or inconsistent with the physician's own medical records. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

As indicated, this court previously remanded the plaintiff's case for further consideration of Dr. Layne's opinion. At that time, United States Magistrate Judge Elizabeth A. Jenkins found that, in the 2008 decision, the law judge had failed to articulate good cause for discounting Dr. Layne's functional assessment (Tr. 744-45). Thus, she explained (id.):

> Assigning limited evidentiary weight and value to Dr. Layne's assessment, the ALJ did not incorporate these limitations into Plaintiff's RFC. (T 614) The ALJ emphasized that Dr. Layne's treatment notes did not include or refer to clinical or laboratory studies. (T 615) The ALJ further reasoned that the assessment was unsupported by or inconsistent with Dr. Layne's own records and inconsistent with clinical studies performed by other providers. (Id.).

> In citing a lack of clinical or laboratory studies, the ALJ appears to have overlooked that Dr. Layne performed two EGDs with biopsies. Moreover, although Dr. Layne's treatment notes, which consist of little more than diagnoses, do not confirm the limitations set forth in his questionnaire responses, they are not inconsistent with those responses. Finally, the ALJ's suggestion that the responses are inconsistent with clinical studies performed by other providers is unavailing given that Dr. Layne was the only treating physician who assessed Plaintiff's functional limitations resulting from gastrointestinal issues.

The plaintiff asserts that the most recent (2011) decision "is no better" than the remanded (2008) decision (Doc. 15, p. 11). In this connection, she states that "[d]espite this court's finding that Dr. Layne's treatment notes are not inconsistent with his limitations, the ALJ now attempts to justify giving Dr. Layne's opinion less weight by claiming that those limitations were not based on his gastroenterology treatment records or lab studies" (id.).

In the 2011 decision, the law judge, after summarizing the opinion of Dr. Layne, stated (Tr. 729-30):

-11-

In its Order, the U.S. District Court noted that Dr. Layne performed two EGD's with biopsies and that the limitations given by him were not inconsistent with his work precluding responses in the questionnaire provided by him. The claimant's representative argued that given Dr. Layne was the only treating physician who assessed the claimant's functional limitations resulting from gastrointestinal issues; a fully favorable decision should be issued. The representative also wrote that the Court found Dr. Layne's opinion was entitled to controlling weight (Ex. 17E, p. 1).

The undersigned United States Administrative Law Judge carefully considered Dr. Layne's opinion, but finds some of Dr. Layne's limitations were not based on his gastroenterology treatment records and lab studies performed or resulting from the claimant's gastric condition. For instance, Dr. Layne had told the claimant not to bend frequently, not to drive automobile equipment, and not have any exposure to dust and fumes. These limitations are more associated with limitations related to disorders of the back or a pulmonary condition, like asthma, which the claimant does not have. Moreover, Dr. Layne indicated reduction in concentration and attention, which would be related to a psychiatric impairment rather than a gastroenterology condition. Nevertheless, some of the physician's limitations were adopted as reasonable overall and supported objectively.

The law judge expressly incorporated Dr. Layne's opinion that the plaintiff could stay on her feet for four to five hours at a time (compare Tr. 528, 729). Similarly, he expressly incorporated the opinion that the plaintiff could sit for two to four hours at a time. In addition, the limitation to light work is consistent with Dr. Layne's opinion of the plaintiff's ability to lift and carry (Tr. 528). Thus, the law judge adopted Dr. Layne's functional limitation on the basic tasks of standing, sitting, and lifting/carrying.

Nevertheless, there is good reason to be skeptical of the care Dr. Layne exercised in filling out the form. Thus, he indicated that the plaintiff could stay on her feet for four to five hours at a time, but also indicated inconsistently that the plaintiff could only stand or walk for two to four hours in an eight-hour workday (id.).

Further, he inexplicably said that the plaintiff could never bend but could crawl occasionally. How could the plaintiff crawl without first bending to get into position to crawl? Moreover, his only explanation regarding bending was that "continuous bending or stooping could cause bile reflux, GERD, ulcer flare up" (id.) (emphasis added). Similarly, the plaintiff

-13-

testified that Dr. Layne told her not to do "a lot of bending and stooping" (Tr. 1011). Thus, not only does the opinion of no bending but occasional crawling appear unreasonable, but the opinion of no bending is contradicted by other evidence.

Further, Dr. Layne purports to be able to opine that the plaintiff in a 40-hour work week will have mild or no pain 15% of the time, moderate pain 30% of the time, moderately severe pain 35% of the time, and severe or extreme pain 20% of the time (Tr. 529). There is nothing in Dr. Layne's notes that would support those opinions. Moreover, Dr. Layne provides no explanation how he arrived at these figures. In fairness to Dr. Layne, this simply seems to be a bad question.

The plaintiff appears to contend that, by not fully accepting Dr. Layne's functional limitations, the law judge failed to follow the court's directive on remand (Doc. 15, p. 11). In other words, the plaintiff takes the position that this court's prior Order requires that Dr. Layne's limitations be adopted. This contention misconstrues the court's Order. The court did not state that the law judge must wholly accept Dr. Layne's opinion on remand.

Rather, Judge Jenkins primarily based her reversal on the fact that the prior law judge in her decision overlooked that Dr. Layne had conducted two EGDs with biopsies (Tr. 744). She added that, "although Dr. Layne's treatment notes, which consist of little more than diagnoses, do not confirm the limitations set forth in his questionnaire responses, they are not inconsistent with those responses" (id.). In other words, Judge Jenkins was simply saying that Dr. Layne's treatment notes neither support nor refute the limitations he opined. Consequently, by referring to only half of Judge Jenkins's thought, the plaintiff is trying to get more out of it than is there.

Contrary to the plaintiff's further assertion (Doc. 15, pp. 11-12), the law judge reasonably determined that "some of Dr. Layne's limitations were not based on his gastroenterology treatment records and lab studies performed or resulting from the claimant's gastric condition" (Tr. 729-30). Thus, Dr. Layne's treatment notes, which consist primarily of diagnoses, fail to mention that the plaintiff had any difficulties with, or limitation regarding, bending, driving, or exposure to dust and fumes (see Tr. 518-26). Although Dr. Layne purports to base his opinion, in part, on the plaintiff's insomnia (Tr. 529), none of his treatment records even mention that diagnosis.

-15-

Further, Dr. Layne's opinion that the plaintiff's impairments interfere with her attention and concentration is seemingly beyond his expertise. Regardless, the law judge found that the plaintiff had moderate difficulties with concentration, persistence, or pace (Tr. 728). Accordingly, he included functional limitations in his residual functional capacity finding to accommodate those difficulties (Tr. 729). There is nothing in Dr. Layne's questionnaire which suggests that the plaintiff had greater limitations in attention and concentration than found by the law judge.

The plaintiff quibbles with the law judge's characterization of Dr. Layne's driving limitation. The plaintiff asserts that, contrary to the law judge's statement, Dr. Layne did not find that she could not drive at all, but that she had a mild limitation against driving automotive equipment (Doc. 15, p. 11). However, as the plaintiff concedes (id.), the law judge's residual functional capacity finding precluded the plaintiff from "extensive driving" (Tr. 729). Unquestionably, the law judge's restriction against "extensive driving" accounts for the "mild" limitation imposed by Dr. Layne.

To the extent that the plaintiff challenges the law judge's determination that she can occasionally bend (Doc. 15, p. 11), this contention

is meritless. As previously explained, the law judge could reasonably conclude that Dr. Layne's restriction to "never" bending is implausible and unsupported.

In all events, any possible error with regard to the law judge's determination that the plaintiff could occasionally bend would not warrant remand. Thus, based on the testimony of the vocational expert, the law judge found that the plaintiff could perform jobs in the national economy of mail sorter, marker, and office helper. The jobs of mail sorter and marker would not require the plaintiff to perform any bending or stooping.[4] See DICOT 209.687-026, 1991 WL 671813; DICOT 209.587-034, 1991 WL 671802.

2. The plaintiff next contends that the law judge "failed to include all of Dr. Whitley's limitations in his RFC assessment despite finding that his opinion is consistent with the record as a whole" (Doc. 15, p. 13). This assertion is also meritless.

On February 20, 2002, Dr. Whitley, a one-time examining psychologist, performed a mental status evaluation on the plaintiff (Tr. 317-

---

[4]The SSA's Work History Report form defines "stooping" as "bend[ing] down and forward at waist" (see, e.g., Tr. 78).

19). Dr. Whitley found the plaintiff with normal affect and a pleasant, albeit sad, mood (Tr. 318). The plaintiff presented with mild evidence of anxiety and depression, but denied suicidal or homicidal ideations (Tr. 318). Dr. Whitley noted that the plaintiff's attitude and cooperation were fair; she was oriented to time, day, month, year, and president; and she could state her address and phone number (Tr. 319). He diagnosed major depression (mild, recurrent) and panic disorder without agoraphobia (id.). Dr. Whitley assigned the plaintiff a Global Assessment of Functioning ("GAF") score of 59 (id.).[5] Dr. Whitley noted that the plaintiff reported several medical issues that would need to be validated by a physician; she had not received or sought treatment since 1999; she had no significant difficulty dealing with the public; she could complete daily activities, organize her own life, and drive; and she indicated having adequate adaptive skills and being able to socialize with others at times (id.). Finally, Dr. Whitley opined (id.):

---

[5]The GAF scale "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders, (DSM-IV-TR) (4th ed., Text Revision), p. 34. A rating of 51-60 reflects "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers")" (id.).

[The plaintiff's] current ability to maintain effort and focus to a routine task is adequate. She appears vulnerable to sustained stress or demands. She appears able to deal with normal levels of stress and change. She is able to maintain her own personal appearance and organize her own day. She appears able to understand and follow simple work instructions under general supervision. Her ability to interact with others in a meaningful, predictable, and emotionally stable manner is guarded. Her ability to use appropriate judgment in a work setting is fair. Her ability to meet deadlines and production norms in a timely manner is limited at present. Based on reported psychological issues, her ability to engage in employment activities is limited but not precluded. It is felt that she is able to manage her own financial issues.

The plaintiff argues that the law judge erred by not accounting for Dr. Whitley's conclusions that (1) the plaintiff "appear[ed] vulnerable to sustained stress or demands"; (2) "[h]er ability to interact with others in a meaningful, predictable, and emotionally stable manner is guarded"; and (3) "[h]er ability to meet deadlines and production norms in a timely manner is limited at present" (Doc. 15, pp. 13-14; see Tr. 319). However, as the Commissioner correctly notes (Doc. 18, p. 10), the law judge's residual

functional capacity finding reasonably encompasses these limitations. Thus, as indicated, the law judge restricted the plaintiff as follows (Tr. 729):

> Mentally, she was limited to understanding, remembering, and carrying out simple, routine, repetitive unskilled instructions with the ability to maintain sufficient concentration, persistence, and pace and to perform mostly simple tasks for 2 hours at a time. This considered the claimant taking the usual breaks. The claimant had the ability to adjust to simple changes in a work setting and to make basic decisions involving superficial contact with the public and avoidance of interaction with large crowds.

The plaintiff asserts that the law judge erroneously omitted in his residual functional capacity a limitation in the ability to meet deadlines or production norms (Doc. 15, pp. 13-14). Although Dr. Whitley opined that the plaintiff's ability to meet deadlines and production norms was limited "at present," he also said that the plaintiff retained an adequate ability to maintain effort and focus on a routine task (Tr. 319). Thus, while Dr. Whitley was indicating that the plaintiff might have difficulty with more complex or demanding jobs, he was indicating that the plaintiff's ability to maintain effort and focus on routine tasks was adequate. Since the plaintiff was limited to

simple repetitive unskilled work, the law judge's residual functional capacity finding is consistent with Dr. Whitley's opinion.

The plaintiff speculates that two of the jobs that the law judge found that she could perform, mail sorter and marker, "would logically require a worker to perform them at a consistent and competitive pace" (Doc. 15, p. 14). However, such speculation is clearly overcome by the testimony of the vocational expert that the plaintiff could perform these jobs. Thus, at the hearing, the law judge asked the vocational expert whether a person with the same age, education, and work experience as the plaintiff would be able to perform work in the national economy with the same restrictions as the law judge included in the plaintiff's residual functional capacity (Tr. 1034-35). The expert testified in response that such an individual would be able to perform the jobs of mail sorter, marker, and office helper (Tr. 1035-36). This testimony provides substantial evidence to support the law judge's finding that the plaintiff could perform the jobs of mail sorter and marker.

The plaintiff also argues that the law judge cannot "assume that a limitation to unskilled work addresses [the plaintiff's] ability to deal with sustained stress" (Doc. 15, p. 14). Dr. Whitley stated that the plaintiff

"appears vulnerable to sustained stress or demands" (Tr. 319). Again, that assessment would cover all types of work, including demanding and complex jobs. However, Dr. Whitley further opined that the plaintiff "appears able to deal with normal levels of stress and change" (id.). Dr. Whitley also noted that the plaintiff "reported adequate adaptive skills" (id.). Therefore, Dr. Whitley's opinion as to the plaintiff's overall ability to handle stress supports the law judge's finding that the plaintiff could deal with simple instructions, perform simple tasks, and adjust to simple changes in a work setting.

Finally, the plaintiff contends that limiting her interaction with the public does not account for her inability to interact with co-workers or supervisors in a meaningful, predictable, and emotionally stable manner, which, she asserts, is "a logical requirement of the office helper position" (Doc. 15, p. 14). This argument fails for several reasons. In the first place, Dr. Whitley did not opine that the plaintiff was incapable of interacting with supervisors and co-workers. Rather, as the law judge noted (Tr. 731), Dr. Whitley indicated that the plaintiff could interact with others, albeit in a "guarded" manner (Tr. 319). Moreover, during cross-examination at the administrative hearing, the vocational expert testified that the jobs he

-22-

identified were "non-social jobs," "meaning they do not deal with the public and they are not done in tandem with other workers. There's not a group effort to complete the job tasks" (Tr. 1041-42).

In all events, the notion that the plaintiff would have difficulty dealing with co-workers or supervisors is not supported by the record. Thus, in a Daily Living Questionnaire, the plaintiff responded "yes" when asked if she got along with her supervisor and co-workers (Tr. 90). Significantly, the plaintiff indicated that she was "tops in sales" in a work environment where it is important to have a "good working relationship at all times" (id.). Further, at the 2008 administrative hearing, the plaintiff testified that she gets along with others in a work environment (Tr. 671). Finally, as indicated, Dr. Whitley assigned the plaintiff a GAF score of 59 (Tr. 319), which reflects only moderate difficulties in social or occupational functioning.

3. The plaintiff also challenges the law judge's consideration of the opinion of Dr. Shepherd, an examining psychologist (Doc. 15, pp. 14-16). Specifically, the plaintiff complains that none of the law judge's reasons for discounting Dr. Shepherd's opinion are supported by the evidence of record.

Dr. Shepherd performed a psychological evaluation on the plaintiff on October 29, 2002 (Tr. 405-08). During the evaluation, the plaintiff told Dr. Shepherd that she had a high school education with some college and had worked as a licensed insurance agent (Tr. 405). The plaintiff further indicated that she had "not had a treatable mental illness, and [did] not report any kind of psychiatric contact or medication" (id.).

As the plaintiff points out (Doc. 15, p. 15), Dr. Shepherd's examination of the plaintiff included "a battery of standardized psychological tests" and evaluations. Dr. Shepherd administered the Wechsler Adult Intelligence Scale test (WAIS-III), and concluded that the plaintiff had a verbal IQ score of 76, a performance IQ score of 79, and a full scale IQ score of 76 (Tr. 405). In this connection, Dr. Shepherd stated (Tr. 406):

> [The plaintiff's] IQ's all fall near the middle of the range of Borderline intelligence. This is a level that one sees typically in special education students, but she makes it doubtful that she actually attended college of any kind, unless it was some type of proprietary institution ... Whether her IQ has ever been higher than it is at present is open to some doubt. There are no fragments in her overall intellectual profile that would suggest higher functioning in the past....

Thus, he said that "this young woman is borderline retarded" (id.). He added that the plaintiff can spell and read at the high school level, which "may suggest that at one time she functioned on a higher level, but this is the only factor in her battery that would lead one to suspect this" (id.). Dr. Shepherd's mental status evaluation revealed no evidence of a psychotic condition, hallucinations, delusions, or dementia; he indicated that the plaintiff's "main problem appears to be a major depressive disorder" (Tr. 407). Dr. Shepherd opined that the plaintiff's condition had reached a chronic stage and that "very little genuine improvement is likely to take place in the foreseeable future" (Tr. 408). Finally, Dr. Shepherd diagnosed major depressive disorder (severe, without psychotic features) and borderline intellectual functioning (id.).

Dr. Shepherd also completed a "Mental Residual Functional Capacity Assessment" form (Tr. 412-13). He indicated that the plaintiff's ability to understand and remember very short and simple instructions was moderately limited, but her ability to carry out those instructions was not significantly limited (Tr. 412). Dr. Shepherd opined that the plaintiff had marked limitations with respect to understanding, remembering, and carrying

out detailed instructions and traveling in unfamiliar places or using public transportation (Tr. 412-13). He further stated that the plaintiff's ability to interact appropriately with the general public, supervisors, and co-workers was moderately limited (Tr. 413). The plaintiff's ability to maintain attention and concentration for extended periods was also moderately limited (Tr. 412).

On November 15, 2002, Dr. Shepherd completed a form called "Medical Assessment of Ability to do Work-Related Activities (Mental)" (Tr. 410-11). In this form, Dr. Shepherd stated that the plaintiff had no useful ability to function independently; a seriously limited and unsatisfactory ability to relate to co-workers, deal with the public, and deal with ordinary work stresses; and a limited but satisfactory ability to follow work rules, use judgment, interact with supervisors, and maintain attention/concentration (Tr. 410). With respect to making performance adjustments, the plaintiff has no useful ability to understand, remember, and carry out complex job instructions; and a seriously limited and unsatisfactory ability to deal with detailed (but not complex) job instructions (Tr. 411). Dr. Shepherd opined that the plaintiff is "unable to do anything that is complex and always has been unable to do so" (id.). Finally, he noted that the plaintiff's ability to

-26-

behave in an emotionally stable manner is "limited, but satisfactory"; and her ability to relate predictably in social settings is seriously limited and unsatisfactory (id.).

With regard to Dr. Shepherd, the law judge stated (Tr. 731) (emphasis in original):

> Dr. Sheph[e]rd, an examining psychologist who examined the claimant upon referral of the claimant's representative, opined the claimant had no useful ability to function independently and her abilities to relate to co-workers, deal with the public, and deal with ordinary work stresses were seriously limited and were unsatisfactory. He determined that the claimant's ability to make complex performance adjustments were significantly limited. Further, Dr. Sheph[e]rd indicated the claimant's abilities to understand, remember, and carry out simple job instructions were limited but satisfactory. He opined the claimant was markedly limited in her abilities to understand and remember detailed instructions, carry out detailed instructions, and to travel in unfamiliar places or use public transportation (Ex. 22F, pp. 7-10). He assessed the claimant with borderline intellectual functioning. This diagnosis is almost totally without merit. Dr. Sheph[e]rd saw the claimant once on referral from the claimant's representative. It is apparent that the examination report relied heavily upon the subjective reports of the claimant and not the objective records. For instance, Dr. Sheph[e]rd's report begins with the

claimant's litany of medical problems and her own
misrepresentation that she had not had a treatable
mental illness, nor did she report any psychiatric
contact or medication, when in fact she did have a
history with Dr. [Asad] Naqvi. Further, her IQ
scores that placed the claimant in the borderline
intellectual range of intelligence are highly suspect
and very inconsistent with the claimant's
educational and work histories in addition to
obtaining a driver licence and driving, which entail
understanding, remembering and carrying out
complex traffic rules. The undersigned United
States Administrative Law Judge finds the opinion
by Dr. Sheph[e]rd of limited evidentiary weight
and value.

The law judge's explanation for discounting Dr. Shepherd's
opinion is reasonable and supported by substantial evidence. Further, as a
one-time examining consultant, Dr. Shepherd's opinion is not entitled to
controlling weight or special significance. Crawford v. Commissioner of
Social Security, 363 F.3d 1155, 1160 (11th Cir. 2004); McSwain v. Bowen,
814 F.2d 617, 619 (11th Cir. 1987).

The plaintiff contends that the law judge improperly discounted
Dr. Shepherd's opinion because it was generated at the request of the
plaintiff's counsel (Doc. 15, pp. 14-15). As indicated by the above quotation,
the law judge did not say that he was rejecting Dr. Shepherd's opinion on this

basis. However, the references may well reflect a skepticism about Dr. Shepherd's objectivity. That skepticism would be heightened by such extreme conclusions as the plaintiff is "borderline retarded" and that it is unlikely she can maintain herself independently. In any event, since the law judge provided several reasons for his finding, even if the law judge improperly noted that Dr. Shepherd was retained by the plaintiff's counsel, this comment does not constitute reversible error.

The plaintiff also asserts that there is no evidence for the law judge's conclusion that Dr. Shepherd's opinion relied heavily on the plaintiff's subjective reports (id., p. 15). However, Dr. Shepherd's report extensively reflects statements by the plaintiff concerning her condition and circumstances (Tr. 406-07).

In a related contention, the plaintiff complains that the law judge failed to explain how her alleged misrepresentation to Dr. Shepherd "makes the psychologist's findings less credible" (Doc. 15, p. 16). The law judge, however, expressly stated (Tr. 731):

> It is apparent that the examination report relied heavily upon the subjective reports of the claimant and not the objective records. For instance, Dr.

-29-

> Sheph[e]rd's report begins with the claimant's litany of medical problems and her own misrepresentation that she had not had a treatable mental illness, nor did she report any psychiatric contact or medication, when in fact she did have a history with Dr. Naqvi.

The law judge thus was pointing out that Dr. Shepherd's iteration of the plaintiff's misrepresentation shows that Dr. Shepherd was relying on the plaintiff's statements. This assessment was reasonable.

Finally, the plaintiff criticizes the law judge's consideration of the low IQ scores reported by Dr. Shepherd in discounting the psychologist's opinion (Doc. 15, p. 16). As indicated, Dr. Shepherd concluded that the plaintiff had a verbal IQ score of 76, a performance IQ score of 79, and a full scale IQ score of 76, placing the plaintiff in the borderline range of intelligence (Tr. 405). The law judge reasonably found that these scores were "highly suspect" (Tr. 731). Thus, as the law judge explained, the IQ scores were "very inconsistent with the claimant's educational and work histories in addition to obtaining a driver license and driving, which entail understanding, remembering and carrying out complex traffic rules" (id.). Consequently,

those dubious test scores could easily cause the law judge to question Dr. Shepherd's assessment of the plaintiff's mental status.

Moreover, the law judge stated that Dr. Shepherd "assessed the claimant with borderline intellectual functioning" and that "[t]his diagnosis is almost totally without merit" (id.). In light of the plaintiff's education and work record, that conclusion is reasonable. Those circumstances also undermine Dr. Shepherd's assessment that the plaintiff "is borderline retarded" (Tr. 406) and "unlikely ... to maintain herself entirely independently" (Tr. 410).

In short, Dr. Shepherd's extreme limitations regarding the plaintiff's mental capabilities are contradicted by her education and her work history. Therefore, the law judge could reasonably discount Dr. Shepherd's opinion.

B. As a second issue, the plaintiff argues that the law judge erroneously discounted her credibility (Doc. 15, pp. 16-21). This contention also lacks merit, as the law judge gave a reasonable explanation, supported by substantial evidence, for finding the plaintiff only partially credible.

The Eleventh Circuit has established a standard for evaluating complaints of pain and other subjective complaints. Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005). As the court of appeals explained in Landry v. Heckler, 782 F.2d 1551, 1553 (11th Cir. 1986), the pain standard "required evidence of an underlying medical condition and (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." If the law judge determines that, under this test, there is objectively determined medical evidence of an impairment which could reasonably be expected to produce disabling pain, the law judge "must evaluate the credibility of claimant's testimony as to pain, and must express a reasonable basis for rejecting such testimony." Hand v. Heckler, 761 F.2d 1545, 1549 n.6 (11th Cir. 1985).

The law judge properly applied the Eleventh Circuit's pain standard. The law judge recognized the need to articulate a credibility determination, and he referred to the pertinent regulations and Social Security rulings (Tr. 732, 735). He also set out the governing principles (Tr. 732). He

-32-

even cited <u>Landry</u> v. <u>Heckler</u> (<u>id</u>.). This demonstrates that the law judge employed the proper analysis. <u>See Wilson</u> v. <u>Barnhart</u>, 284 F.3d 1219, 1225-26 (11th Cir. 2002).

Significantly, the law judge did not wholly discount the plaintiff's complaints of pain. The law judge discussed the plaintiff's testimony in his decision, and he specifically noted the plaintiff's allegations of extreme headaches, chest and stomach pain, digestive problems, and panic and anxiety attacks (Tr. 732-34). After considering the plaintiff's testimony, along with the objective medical evidence, the law judge restricted the plaintiff to light work activity with postural, environmental, and mental limitations (Tr. 729).

In his credibility determination, the law judge gave a cogent explanation for declining to credit fully the plaintiff's subjective complaints. Specifically, the law judge stated (Tr. 734-35):

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent

with the above residual functional capacity assessment. Record establishes the claimant moved in with her mother to care for her who had vision problems (Ex. 8E). Taking care of an elderly individual with health problems can be quite demanding, both physically and emotionally, and still the claimant was able to endure such stress.

Regarding her mental limitations, the claimant saw Dr. Naqvi periodically from late 1997 to late 2000 but with significant gaps in treatment for which the medical professional admonished her. There is no evidence of further mental health treatment after she stopped seeing Dr. Naqvi in 2000 and her misrepresentation to Dr. Sheph[e]rd is significant in that regard. As noted above, Dr. Sheph[e]rd noted that she had apparently not had a treatable mental illness nor did she report any kind of psychiatric contact or medication (Ex. 22F). Further, she told the psychologist that she was unable to go out alone or do anything outside of the home or away from her mother and that she was experiencing unremitting, chronic severe pain. Yet, she was able to attend a "mission" trip to Africa (Ex. 23F, p. 5). The flights entailed an 8-hour flight to London with a layover followed by another 8-hour flight to Nigeria. At the hearing, the claimant testified that her physician had advised her to go to "take her mind off things." If she was in such chronic pain preventing her [from] work, going on a long distance trip to Africa tends to suggest that the alleged symptoms and limitations were probably overstated.

Pertaining to her chronic chest pain, the claimant complained of chest pain for more than 5 years but with negative cardiac evaluations. She had numerous tests and scans, which were essentially normal, and a cardiac catheterization of November of 1997 was normal with an ejection fraction of 70%. For her hypertension, there was no evidence of end organ damage.

At the current hearing, as to the claimant's appearance, she looked her stated age. The claimant was appropriately dressed and had good personal hygiene and grooming. The claimant remained sitting during the approximately hour and half hearing without significant difficulty observed from a lay perspective. The claimant used no assistive devices and her gait was normal. Her posture and motor behavior were normal. Eye contact was appropriate. At the end of the hearing, the claimant stood up and walked out of the courtroom with a normal gait and no difficulty observed.

As to the claimant's demeanor, she was cooperative and responsive to questions. The claimant was alert and aware of what went on at the hearing. The claimant paid good attention, was well focused, and understood the questions appropriately giving detailed answers about events many years prior to the hearing. The claimant's manner of relating, social skills, and overall presentation were adequate. The claimant's speech was intelligible, logical, coherent, goal directed, and she kept her trend of thought. In sum, the claimant exaggerated her symptoms and

> restrictions.   These are not supported by the
> medical signs and laboratory findings to the level
> of disability alleged during the relevant period of
> time.

This explanation is sufficient to discount the plaintiff's subjective complaints.

See Heppell-Libsansky v. Commissioner of Social Security, 170 Fed. Appx.

693, 699 (11th Cir. 2006).

The plaintiff's credibility challenge essentially consists of petty

complaints of some points made by the law judge in his decision.   That

challenge ignores the highly deferential nature of the credibility finding.   The

law judge is the only person in the review chain that actually sees and hears

the plaintiff.   Moreover, unlike lay jurors, he is trained in the law in general

and in Social Security matters in particular.   His duty is to consider the

testimony of the plaintiff and other witnesses and give adequate reasons if he

discounts that testimony.   Wilson v. Barnhart, supra, 284 F.3d at 1225.   His

reasons do not have to be compelling or persuasive, simply adequate.   Allen

v. Sullivan, 880 F.2d 1200, 1203 (11th Cir. 1989).   The law judge's lengthy

explanation in this case for his credibility determination amply meets that

requirement.

The plaintiff objects to the law judge's statement that she "testified to little activities of daily living; however, these assertions cannot be objectively verified" (Doc. 15, p. 17; see Tr. 733). Thus, taking the position that the "Commissioner requires the ALJ to consider the claimant's daily activities reported by the claimant when evaluating credibility," the plaintiff suggests that the law judge applied an improper legal standard (Doc. 15, p. 17). The regulations do not, however, require that the law judge consider daily activities as "reported by" the plaintiff when evaluating credibility. Rather, the regulations simply state that the law judge is to consider "daily activities," among other factors. 20 C.F.R. 404.1529(c)(3). That is exactly what the law judge did in this case (see Tr. 733).

The plaintiff argues that the law judge improperly stated that the plaintiff's "alleged headaches were mentioned only a few times in the record" (Doc. 15, p. 17; see Tr. 733). In this regard, the plaintiff points to several treatment notes, as well as her hearing testimony, documenting her allegation of headaches. However, a mere diagnosis of an impairment is not sufficient to establish disability. McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986). Rather, it is necessary to show functional limitations from the

-37-

impairments. <u>Moore</u> v. <u>Barnhart</u>, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005). By simply referring to diagnoses, the plaintiff fails to demonstrate how her headaches created any functional limitations during the relevant period beyond the law judge's residual functional capacity. <u>Id</u>.

Contrary to the plaintiff's further contention, the record supports the law judge's finding that the plaintiff cared for her mother, who had vision problems (Doc. 15, pp. 17-18). For example, a Daily Living Questionnaire completed by the plaintiff expressly states, "[i]n 1997 my brother who cared for my mother died, so I had to move back to Milledgeville to care for her" (Tr. 86). Further, at the February 2008 administrative hearing, the plaintiff testified that she moved in with her mother in 1997, and her mother had vision problems which required cataract surgery in 1998 (Tr. 694). The plaintiff also explained that she would fix her mother breakfast and would "sometimes" perform household chores such as cleaning and turning on the washing machine (Tr. 694-95). Finally, Dr. Whitley noted that the plaintiff's daily routine involved "driving her mom on errands and appointments" (Tr. 318; <u>see</u> Tr. 319).

Attempting to bolster her credibility, the plaintiff again points to the report of Dr. Shepherd (Doc. 15, p. 18). As previously explained, the law judge had a reasonable basis for discounting Dr. Shepherd's opinion. Therefore, the plaintiff's reliance on Dr. Shepherd's statements is unpersuasive.

Next, the plaintiff challenges the law judge's finding that her church mission trip to Africa suggests that her symptoms and limitations were exaggerated (id., pp. 18-19).  The plaintiff attempts to minimize the significance of this trip, noting that she shared rooms with three women who were "mother-type" figures; the only activities she participated in were nightly services and daily prayer sessions; and she was "very sick" during the flights home. The law judge, however, was not required to accept the spin the plaintiff has placed on a strenuous adventure. As the law judge noted, "[t]he flights entailed an 8-hour flight to London with a layover followed by another 8-hour flight to Nigeria" (Tr. 734).

In any event, the law judge reasonably concluded that the plaintiff's trip to Africa belies the credibility of her allegations. For example, the plaintiff was able to undertake such a lengthy trip, despite previously

indicating to Dr. Shepherd that she is very dependent on her mother and that she "does not take it on herself to make any major decision or ... to go anywhere significant, except in the company of her mother" (Tr. 406, 407). Moreover, if the plaintiff's impairments were as disabling as the plaintiff alleges and she was as functionally limited as Dr. Layne opined (see Tr. 528-29), it is unlikely that Dr. Layne would have approved of an out-of-country, two-week mission trip, as the plaintiff testified he did (Tr. 579, 682-83, 1016).

The plaintiff complains that the law judge implied that the plaintiff was not credible about her depression and panic attacks because she had not had psychiatric treatment since December 2000 (Doc. 15, p. 19). She argues that the treatment ended when her insurance would no longer pay for it so that the law judge could not draw adverse inferences from the failure to continue treatment (id.). However, the law judge did not draw any such inferences regarding depression and panic attacks from that circumstance. Rather, all he said was: "There is no evidence of further mental health treatment after she stopped seeing Dr. Naqvi in 2000 and her misrepresentation to Dr. Sheph[e]rd is significant in that regard" (Tr. 734).

Accordingly, the law judge found that the plaintiff had severe impairments of anxiety with panic symptoms and major depression (Tr. 724).

In a related argument, the plaintiff criticizes the law judge for indicating that there were "significant gaps" in her treatment with her mental health provider, Dr. Naqvi, for which she was admonished (Doc. 15, p. 19). She points out that Dr. Naqvi only confronted her on one occasion (id.). However, the law judge reasonably determined that this confrontation, which followed a gap in treatment of approximately ten months, undermines the plaintiff's allegations regarding the severity of her mental impairments during the relevant period.

The plaintiff again attacks the law judge's consideration of Dr. Shepherd's notation that the plaintiff said she did not have a treatable mental illness and she did not report any psychiatric contact or medication (id., pp. 19-20). Although the plaintiff contends that she "had no reason to understate the degree to which she sought and received treatment," that is apparently what she did. The law judge could reasonably find in assessing the plaintiff's credibility that this misrepresentation was significant, regardless of what the

plaintiff was thinking when she misinformed Dr. Shepherd about her prior psychiatric history.

Next, the plaintiff objects to the law judge's citation to her essentially normal cardiac test results and findings in the credibility determination (id., p. 20). Plainly, normal physical examination findings may undermine the credibility of the plaintiff's testimony that she is totally disabled from working. See, e.g., Pettaway v. Astrue, 376 Fed. Appx. 889, 890 (11th Cir. 2010)(normal physical examinations with only mild to moderate limitations belied the credibility of the plaintiff's testimony concerning severity of her pain). On the other hand, normal physical examinations do not necessarily mean, and the law judge did not state, that she is painless or lacks functional limitations. Rather, the law judge could reasonably conclude, as he did, that normal physical examinations show that the plaintiff is exaggerating the intensity of her symptoms. See 20 C.F.R. 404.1529(c).

Finally, the plaintiff challenges the law judge's reliance in his credibility determination on her demeanor and behavior at the administrative hearing (Doc. 15, pp. 20-21). This contention is unavailing. The law judge is not prohibited "from considering the claimant's appearance and demeanor

during the hearing," as long as he does "not reject the objective medical evidence and claimant's testimony solely upon his observation during the hearing." Norris v. Heckler, 760 F.2d 1154, 1158 (11th Cir. 1985).

In sum, the plaintiff's argument that the law judge's credibility finding was flawed lacks merit. The law judge properly applied the Eleventh Circuit pain standard, and, based on that standard, made a reasonable decision to accept the plaintiff's subjective testimony to the extent it limited her to light work with additional restrictions, but to reject the testimony to the extent it claimed total disability. Moreover, the law judge set forth, in detail, the basis for that determination.

It is appropriate to add that there are no medical records from 2004 to 2007. Further records from 2008 and thereafter do not reflect a disabling condition, despite the fact that the plaintiff was at least about four years older and in the category of advanced age. For example, notes from April and August 2008 indicate with respect to mood and affect: "no depression, anxiety or agitation" (Tr. 917, 946); a note of August 2008 indicated that acid reflux symptoms were well-controlled on therapy (Tr.

917); and a note of October 2009 reported that the plaintiff was exercising six to seven days per week (Tr. 874).

It is, therefore, upon consideration

ORDERED:

That the decision of the Commissioner of Social Security is hereby **AFFIRMED**. The Clerk shall enter judgment in accordance with this Order and **CLOSE** this case.

DONE and ORDERED at Tampa, Florida, this _17_ day of June, 2013.

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE